## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

KYLE THISTLETHWAITE,
PATRICIA THISTLETHWAITE, and
PAUL THISTLETHWAITE,

      **Plaintiffs,**

v.                                      **Case No. 14cv00138  WJ/RHS**

ELEMENTS BEHAVIORAL HEALTH,
INC., a foreign corporation,
TRS BEHAVIORAL CARE, INC.,
d/b/a THE RIGHT STEP,
a foreign corporation, and
SAN CRISTOBAL TREATMENT
CENTER, LLC, a foreign limited liability company,

      **Defendants.**

---

### MEMORANDUM OPINION AND ORDER
### GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS and BREACH OF IMPLIED CONTRACT

THIS MATTER comes before the Court upon a Motion for Partial Summary Judgment on Plaintiffs' Claims of Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress and Breach of Implied Contract, filed on January 12, 2015 by Defendants Elements Behavioral Health, Inc. ("Elements"), TRS Behavioral Care, Inc. ("TRS") and San Cristobal Treatment Center, LLC ("SCTC") ("Defendants") **(Doc. 43)**.  Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is well-taken and, accordingly, it is GRANTED.

### BACKGROUND

SCTC and TRS provided drug addiction treatment services to Plaintiff Kyle

Thistlethwaite ("Kyle"), the son of Plaintiff Patricia Thistlethwaite ("Patricia") and Plaintiff Paul

Thistlethwaite ("Paul") (hereinafter collectively "Plaintiffs").  Kyle, age 19, enrolled in a

voluntary 90 day inpatient drug addiction treatment program beginning October 26, 2012 at

SCTC at a cost of $40,000 paid by Patricia and Paul.   Kyle completed and signed all admissions

paperwork.  On January 2, 2013, SCTC and TRS announced that SCTC would cease operations

and did so five days later on January 7, 2013, 16 days short of the 90-day treatment term. The

closure of SCTC is the basis for all claims against Defendants.

Plaintiffs allege that the closure harmed Kyle physically and emotionally, as the closure

improperly interfered with his ongoing drug addiction treatment and that the early closure caused

Kyle to relapse.  Finally, Plaintiffs allege that the relapse caused emotional harm to Patricia and

Paul.

The complaint asserts nine claims:

Count One:     Breach of Contract
Count Two:     Tortious Interference with Contract
Count Three:  Fraud
Count Four:    Negligent Misrepresentation
Count Five:    Intentional Infliction of Emotional Distress
Count Six:       Negligent Infliction of Emotional Distress
Count Seven:  Medical Negligence
Count Eight:   Negligence
Count Nine:    Unjust Enrichment

Count Seven, which alleges medical negligence, has been dismissed on Plaintiffs'

unopposed motion.  Doc. 46.   The present Motion seeks summary judgment only on Counts IV

and V (Negligent and Intentional Infliction of Emotional Distress), as well as a breach of implied

contract which Defendants contend may be part of Count I in that it may include a claim based

on a theory of implied contract.

## I.      Factual Background[1]

Defendants present 19 statements of undisputed statements of fact which are supported by deposition testimony and answers to interrogatories.  Plaintiffs claim to "dispute" 11 of those facts (¶¶ 1, 2, 9, 11, 12, 13, 14, 15, 16, 17 and 19) on the basis that the facts are misleading and require clarification.   The Court agrees with Defendants that these responsive facts make no argument whatsoever regarding Plaintiffs' ability to recover under claims of intentional infliction of emotional distress, negligent infliction of emotional distress, or breach of implied contract.   In the following section, the Court describes Defendants' statement of facts along with Plaintiffs' unsuccessful attempts to create "disputes" on those facts.

### A.      Defendants' Statements of Fact 1 and 2

Defendants' Statement of Fact ("SOF") 1 states that "each of the Plaintiffs claims that he or she suffered severe emotional distress due to the early closure of SCTC."   Plaintiffs dispute this fact on the basis that it fails to distinguish between the different effects suffered by each Plaintiff.   Plaintiffs add facts which flesh out the basis for each claim of the three Plaintiffs, but none of the additional facts creates any material dispute.  For example, Plaintiffs' response to Defendants' SOF 1 states that Patricia testified that it was comforting when she and her husband knew where her son was at night and that someone around was watching out for her child's best interests.  Kyle testified that he suffered from  abandonment and trust issues as a result of being adopted and had made three suicide attempts prior to his admission to SCTC, and after his departure from SCTC had picked up felony charges for possession of methamphetamine and possession of a stolen vehicle.   In SOF 1, Defendants state that Plaintiffs have each made claims

---

[1]   References to many of the supporting exhibits for these facts are generally omitted, since they can be found in the parties' briefs.  Plaintiffs' response brief, however, contains no Exhibits 3 or 4.  *See* Doc. 61 at 4, n.1 (noting same by Defendants in reply).  Also, while there is a reference in the response brief to Exhibit 3, there are no references to Exhibit 4 at all.  *See* Doc. 51 at 7.  The Court also notes that Plaintiffs' counsel has not marked the portions of exhibits he wishes to bring to the Court's attention, as required under D.N.M.LR-Civ. 10.6.

of emotional distress—and this is accurate.  Additional statements of fact describing their

testimony fails to refute that statement.

Plaintiffs also dispute Defendants' SOF 2 which states that Kyle testified that after the

closure of SCTC, he felt abandoned, sad and suffered a relapse because he "was not ready" and

because it closed, he continued to fall "into a downward spiral."   Plaintiffs claim the statement is

"misleading" because the "downward spiral" mentioned by Kyle and referred to by Defendants

occurred after Kyle's premature discharge and included several drug relapses.  Again, Plaintiffs'

response fleshes out Kyle's testimony, but it does offer any contrary facts.

Paul described his emotional distress as follows:

> as a parent to know that that illness has returned is just emotionally devastating.
> He went from a safe, secure location to a halfway house where he quickly
> relapsed. So I mean the panic of parents when that phone rings and you don't
> know if your son has relapsed or if he is in the hospital or if he is in jail, it's just
> immense emotional stress and pressure, uh, when you don't know that your son is
> going to survive.

Ex. C, at 85:6-16.   Patricia claims she suffered emotional distress due to the closure of the

SCTC, to include "the elongation of the substance abuse," which she described as "[a] lot  of

tears, a lot of emotional times" and "emotional stress on [her]  body" relative to her energy

levels.   Ex. D at 94:9-25 to 96:1-14.   Patricia was on depression medication, but her prescription

and dosage predated the closure of SCTC.   *See* Exhibit D at 96:17-25 to 97:1-18.

It is undisputed that Paul and Patricia did not seek any type of medical treatment relative

to their claims of emotional distress.   Ex. C at 85:17-19; Ex. D at 96:15-18.   Paul did not take

any type of medication to help with his claims of emotional distress.   Exhibit C at 83:20-23.   He

testified that he experienced an approximate 20 pound weight gain as a physical manifestation of

the stress he experienced, but his weight gain started in October of 2012, two to three months

before the closure of the SCTC.  Ex. C at 85:24-25 to 86:1-6.

B.      Defendants' SOF 9 through 12

According to SOF 9-12, Defendants state the following:

- Plaintiffs claim that Kyle Thistlethwaite suffered a relapse while he was participating in an aftercare program in Asheville, N.C. called Real Recovery (SOF 9); and

- Kyle's parents did not go to North Carolina with Kyle, but instead learned of Kyle's relapse over the telephone, and discussed the relapse with Real Recovery employees over the telephone (SOF 10-12).

Plaintiffs claim that Defendants' reference to a "relapse" is "misleading" and minimizes what Plaintiffs experienced, because the evidence indicates that Kyle suffered from a number of relapses dating from his first week out of SCTC to April of 2013, when he was incarcerated.   In his deposition, Kyle testified that he has two periods of relapse, January to April 2013, and from May 2013 until September 2014.   Kyle stated that he was released from Real Recovery in mid-April because had been caught drinking which was a violation of the rules in that facility.  Ex. B at 7-11.   Kyle admitted that he had been drinking "on a regular basis" at Real Recovery for almost 3 months until they finally "caught" him.   Ex. B at 13.  Between April and May of 2013, Kyle was in jail at the Spartanburg Corrections Facility in Spartanburg, South Carolina on charges of manufacturing methamphetamine and possession of a stolen vehicle.  Ex. B at 7-8. Following his release from Real Recovery in April 2013, Kyle went to a "lower-grade halfway house" in Asheville for about two weeks before he was caught drinking and was told to leave, after which he lived at a homeless shelter for 2 and a half days.  Ex. B at 9-10.   He was then accepted into the Pinnacle House, a specialized treatment center that is associated with the Real Recovery treatment program.   Ex. B at 15.

Plaintiffs make it seem as though Defendants have purposely overlooked this testimony, when in fact Defendants rely on exactly the same portions of deposition testimony cited by Plaintiffs for evidentiary support SOF 9.  *See* supporting exhibits to SOF 9 (citing to Ex B at 6-9

and portions of pages 14 through 17, 18 and 19).   Thus, Plaintiffs have presented no factual

"discrepancies" as to Defendants' SOF 9-12.

C.     Defendants' SOF 13 through 19

Defendants' SOF 13 -19 are undisputed, and state the following:

- Patricia Thistlethwaite had no firsthand knowledge of any subsequent relapses suffered by
Kyle;

- Patricia and Paul Thistlethwaite split responsibilities in the management of Kyle's treatment;

- Paul was predominantly responsible for the financial side and Patricia was responsible for
communicating with the managers at Real Recovery to find out how Kyle was doing;

- Kyle made the decision to go to treatment at SCTC and agreed to attend a 90 day program;

- By December 25, 2012, Kyle had made the decision to attend an aftercare program or sober
living program at Real Recovery and his plan was to attend the aftercare program after the 90
day  treatment term;

- SCTC did not offer a Sober Living option;

- Kyle was the sole decision maker relative to any agreement to seek drug addiction treatment;
and

- Kyle Thistlethwaite learned that SCTC was closing on January 3, 2013.

Plaintiffs' responses offer no factual disputes.  For example, the fact that Patricia  was

"aware" of her son's relapses does not refute the fact that she did not witness any of the relapses.

*See* Pltffs' Resp. to Defts' SOF 13.  Also, the fact that Kyle chose SCTC from among three

choices given to him by his parents does not dispute Defendants' SOF 15 which states that Kyle

made the decision to attend SCTC for its 90-day treatment program.

**II.     Legal Standard**

Defendants are entitled to summary judgment if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The primary purpose of Rule 56 is to determine whether genuine factual issues exist which

require resolution by the fact finder such that a trial is necessary.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Defendants bear the initial burden of showing the absence of any genuine issues of material fact and entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670- 71 (10th Cir. 1998).  Defendants can meet this burden by pointing out to the Court that there is an absence of evidence to support Plaintiffs' case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once this burden is met, Plaintiffs must present specific record evidence showing that a genuine issue exists for trial on those dispositive matters on which they have the burden of proof.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see* Fed. R. Civ. P. 56(c)(1) (the party opposing summary judgment must cite to particular materials in the record to support claims of disputed issues of fact).  A mere "scintilla" of evidence in Plaintiffs' favor is insufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 252.  Summary judgment is properly granted where a rational trier of fact, considering the record as a whole, could not find for Plaintiffs.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendants seek summary judgment on Plaintiffs' claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of implied contract.  As discussed previously, Plaintiffs' responsive facts fail to create any real factual disputes.  In addition, Plaintiffs offer no argument in response to Defendants' arguments on each of the claims, as illustrated here:

> Plaintiffs' deposition testimony reveals that there are genuine disputes as to multiple material facts central to Plaintiffs' claims, to such an extent that Defendants are not entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Defendants' Statement of Undisputed Material Facts (UMF) overstates, misleads, and minimizes Defendants' culpability, and most important, is not supported by the actual record when placed in proper context. Defendants have not met their

> initial burden by showing an absence of genuine issues of material fact in order to
> sustain a summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
> Plaintiffs have presented more than a sufficient amount of evidence contrary to
> Defendants' assertions showing that there are genuine disputes as to material facts
> in order to survive summary judgment.

Doc. 51 at 11-12. The above constitutes Plaintiffs' entire nine-line "Argument and Authority"

section in response to Defendants' corresponding nine-*page* "Argument and Authority" section.

Plaintiffs flatly state that material facts exist, but they never actually get around to explaining

*how* their responsive facts preclude summary judgment on each of those claims.[2]

## I.      Intentional and Negligent Infliction of Emotional Distress (Count 5)

In regard to their claim of intentional infliction of emotional distress ("IIED"), Plaintiffs

allege that as a result of the actions of Defendants' TRS' and SCTC to terminate Kyle's

treatment program on short notice, Plaintiffs suffered severe emotional distress; and that the

conduct of these Defendants was extreme and outrageous, specifically their "haphazard shutting

down of a residential treatment program without regard to the needs and expectations of

Plaintiffs. . . ." Compl., ¶¶119, 121 & 122. Plaintiffs also allege that Defendant Elements is

liable for the tortious conduct of its subsidiaries (Defendants TRS and SCTC) under theories of

apparent agency or vicarious liability. . . ." and that Defendants Elements and TRS participated

in, authorized, or ratified Defendant SCTC's premature shutting down of its facility. ¶¶120 &

125.

To support an IIED claim, Plaintiffs must present competent evidence that: (1)

Defendants' conduct was extreme and outrageous; (2) Defendants' conduct was intentional or in

reckless disregard of Plaintiffs; (3) Plaintiffs' mental distress was extreme and severe; and (4)

there was a causal connection between Defendants' conduct and Plaintiffs' mental distress.

---

[2] However, in all fairness to Plaintiffs, it would be practically impossible to mount an argument that can stand up to Defendants' arguments on any of the claims when Plaintiffs have failed to present any material factual disputes.

*Gioia v. Pinkerton's Inc*., 194 F.Supp.2d 1207, 1220 (D. N.M. 2002). Extreme and outrageous conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community." *Trujillo v. N. Rio Arriba Elec. Coop., Inc*., 131 N.M. 607 (2004); *see also* N.M. U.J.I. 13-1628 ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person."). The outrageous conduct requirement is a "high" and "exacting" standard regarded as a significant limitation on recovery. *Baldonado v. El Paso Natural Gas. Co*., 143 N.M. 297 (Ct.App. 2008) ("being required to prove the tortfeasor's intent or recklessness imposes a significantly higher burden than is required for mere negligence actions") (internal citations omitted).

Plaintiffs' claims rest solely on the closure of the SCTC facility before the 90-day treatment term had been completed.  In their Answers to Interrogatories, they state that:

- Defendants were aware or should have been aware of Plaintiff Kyle Thistlethwaite's extreme emotional vulnerability;

- Defendants were aware or should have been aware that Plaintiffs Paul and Patricia Thistlethwaite were deeply concerned with their son's welfare and well-being;

- Defendants were aware or should have been aware of the likely detrimental effect of any premature closure of the facility upon Plaintiff Kyle Thistlethwaite's mental wellbeing, physical, and emotional health;

- Defendants were aware or should have been aware of the likely detrimental effect upon Paul and Patricia Thistlethwaite's well-being and emotional health should their son;

- Plaintiff Kyle Thistlethwaite, be harmed in any way as a result of the facility's closure.

Defts's  SOF 1; Ex. A (Ans. to Interrog. No. 13).

None of these statements meet, individually or together, meets the "high" and "exacting" standard of outrageous conduct necessary to support the claim.  Further, Plaintiffs present no evidence that describes specific conduct on the part of Defendants from which a reasonable fact

finder could infer recklessness. These assertions describe the more common variety of negligence than the much higher standard required for IIED.  The fact that SCTC prematurely closed its doors is simply not enough to bring it within the context of an IIED claim.   Further, even assuming that Plaintiffs' mental distress was extreme and severe, Plaintiffs offer nothing vaguely resembling facts which would suggest that the early closing of SCTC *caused* Plaintiffs' injuries. Kyle testified that after the closure of SCTC, he felt abandoned and sad because he was "not ready" for release.  Defts' SOF 1.

Sadness and stress are legally insufficient "to be of such an intensity and duration that no ordinary person would be expected to tolerate it."  *Gioia,* 194 F. Supp. 2d at 1220-21 (granting summary judgment on the intentional infliction of emotional distress claim because, despite describing his emotional distress as severe, the plaintiff never visited a doctor or mental health specialist, was not prescribed medication, and was able to return to work); *Trujillo*, 131 N.M. 607 (reversing jury verdict on intentional infliction of emotional distress claim for a plaintiff because the evidence was legally insufficient where the plaintiff was offended by a termination letter, felt resentment after giving his employer years of service, felt lousy and depressed, was prescribed Prozac, and slept long hours and had erratic eating habits); *cmp. Baldonado*, 143 N.M. 297 (reversing the dismissal of firefighters' claims of intentional infliction of emotional distress where firefighters witnessed explosion burn victims suffering from "undeniably horrific" injuries, including survivors who were conscious and were visibly in excruciating physical and emotional agony).

It is undisputed that neither Patricia nor Paul sought any type of treatment for any claim of emotional distress.   Paul testified that his weight gain started two to three months *before* the closure of SCTC.  Patricia testified that she started taking medication for depression when Kyle

was a junior in high school—years before SCTC closed its doors, and her dosage was never increased after that occurred.  Because Plaintiffs have not presented any factual disputes which would withstand summary judgment and advance their IIED claim to trial, Defendants are entitled to summary judgment on this claim.

## II.        Negligent Infliction of Emotional Distress (Count Four)

Plaintiffs' claim of negligent infliction of emotional distress ("NIED") is premised on the following allegations:

- Defendants TRS and SCTC acted negligently by shutting down the treatment program early;

- As a result of Defendants TRS' and SCTC's negligent actions to terminate Kyle's treatment on such short notice, Plaintiffs experienced severe emotional distress, and Paul and Patricia Thistlethwaite suffered negligent infliction of emotional distress as bystanders.

Compl, ¶¶142, 143 & 144.   Plaintiffs also allege claims based on agency theories on Defendant Elements based on the alleged conduct of Defendants TRS and SCTC.  Compl., ¶145.

To prove NIED, a plaintiff must show that: (1) a marital or intimate family relationship existed between the plaintiff and the victim, (2) the severe emotional trauma suffered by the plaintiff was a consequence of contemporaneous sensory perception of the accident, and (3) the victim suffered physical injury or death.  *Folz v. State*, 110 N.M. 457, 470 (1990); *see Fernandez v. Walgreen Hastings Co*., 126 N.M. 263 (1998) (to establish negligent infliction of emotional distress, Plaintiffs must show a bystander "suffered severe emotional shock as a result of witnessing a sudden, traumatic event that causes serious injury or death to a family member.") (emphasis added); and U.J.I 13-1629 ("Emotional distress is 'severe' if it is of such an intensity and duration that no ordinary person would be expected to tolerate it"); *see Akutagawa v. Laflin, Pick & Heer, PA*., 138 N.M. 774, 779 (N.M.App.,2005) (New Mexico does not recognize

negligent infliction of emotional distress as a cause of action except for bystander liability)

(citing *Jaynes v. Strong Thorne Mortuary, Inc.*, 124 N.M. 613 (1998)).

The Court assumes that Patricia and Paul are basing their bystander claims of NIED on perceiving a serious injury to their son Kyle, and that they allege as the "serious injury" requirement as Kyle's relapse after leaving SCTC.  *See* Compl., ¶ 144.   Even assuming that Kyle's relapses constitute a "severe injury" for an NIED claim, Plaintiffs cannot possibly argue that Kyle's parents were bystanders.  Plaintiffs do not dispute that either Patricia or Paul witnessed any of Kyle's relapses.  These relapses occurred while Kyle was undergoing treatment at Real Recovery in Asheville, N.C., and Patricia and Paul did not go to North Carolina with Kyle.  Instead, Plaintiffs argue that Patricia's and Paul's parental *awareness* of Kyle's relapses suffices to satisfy the contemporaneous sensory perception requirement. There is no authority for substituting awareness for that requirement, even if Kyle's parents were aware of every one of Kyle's setbacks.[3]   Because Plaintiffs set forth no evidence that either Patricia or Paul Thistlethwaite witnesses a "severe injury" to support their claim of NIED, their claim cannot withstand summary judgment.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331 (1986) (Summary judgment is appropriate when "the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim").

Kyle's NIED claim fares no better.   His testimony was that after SCTC closed, he felt abandoned, sad and went into a "downward spiral because he "was not ready." Ex. B at 165. Again, even assuming these feelings and experiences constitute a "severe injury," his claim is legally deficient because he cannot argue that he was a bystander who perceived a serious injury to himself.  *See Fernandez v. Walgreen Hastings Co.*, 126 N.M. 263, 266 (N.M.,1998) ("NIED

---

[3]  In fact, Plaintiffs admit that Patricia was not even aware of all of Kyle's relapses until they were reported to her by the staff at Real Recovery.  Doc. 51 at 8.

is an extremely narrow tort that compensates a **bystander** who has suffered severe emotional shock as a result of witnessing a sudden, traumatic event that causes serious injury or death to a family member") (emphasis added).   Accordingly, Defendants are entitled to summary judgment on Plaintiffs' NIED claims.

### III.    Breach of Implied Contract (Included as Part of Count One)

Defendants read Count One to allege a breach of contract that is based on two separate alleged breaches: closing SCTC "three weeks before Defendant [sic] Kyle T. reached 90 days of treatment," Compl., ¶47, and foreclosing the "possibility that Plaintiff Kyle T. could receive further treatment beyond 90 days at the same facility" (Compl, ¶53).   The Court makes no finding here as to whether Count One does in fact allege a breach of implied contract claim (and of course, Plaintiffs' nine-line "argument and authorities" section sheds no light on that question), but will assume such a claim is alleged.   Defendants' motion seeks summary judgment on this second stated basis for breach of contract, namely that Kyle was denied the opportunity for treatment beyond the 90-day term of treatment at SCTC.

Plaintiffs rely on the Payment Plan Agreement ("Plan") to support their breach of contract claim.   *See* Ex. 1 to Compl.   The Plan states that Kyle will undergo treatment from October 26, 2012 through January 23, 2013 in exchange for $40,000.   *Id.*   The Plan mentions that Plaintiffs are not entitled to a refund, but there is no language referring to any agreement among the parties that treatment was promised after the stated 90-day term.   Defendants believe that Plaintiffs may be attempting to proceed upon an implied-in-fact contract theory to support a claim that treatment beyond the 90 day term was agreed upon by contract.[4]   An implied-in-fact

---

[4]    Based on the lack of responsive argument from Plaintiffs on any of the claims addressed in Defendants' motion, the Court believes that Defendants may be giving Plaintiffs' counsel too much credit in construing Count I to include a claim based on an implied-in-fact contract theory.   Nevertheless, since Defendants have taken pains to raise this issue, the Court will address it.

contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred . . . from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."   *Orion Technical Resources, LLC v. Los Alamos Nat. Sec., LLC*, 287 P.3d 967, 971 (N.M.Ct.App. 2012) (distinction between an express and implied contract involves "no difference in legal effect, but lies merely in the mode of manifesting assent").   An implied contract is based upon "the parties' mutual assent as manifested by their conduct."   *Id*.   Relevant factors are the parties' course of dealing, course of performance, usage of trade, written representations, or oral representations.   *Id*., 287 P.3d at 971-72.

It is undisputed that at all relevant times in this lawsuit, Kyle was over the age of 18 and as such, was and is a legal adult.   Accordingly, as an adult, Kyle was responsible for deciding whether to agree to treatment or to refuse treatment.   Defts' SOF 18.    Plaintiffs attempt to refute this fact by suggesting that Kyle could not have been the sole decision maker because he was financially dependent on his parents and could not pay for the treatment himself.   Resp. at 11.   However, the fact that Kyle's parents paid for Kyle's treatment is insufficient to suggest that someone other than Kyle could agree to treatment past the 90-day term, and Defendants present testimony to support this contention:

Q: Is it ultimately the client's decision about where he or she is going to go?

A: Yes, contingent on what the family can support and what program will accept the client.

Q: And the contingency on the family being – let's say you have to have it covered by insurance, that you can't self-pay it, so you have to pick a program that would potentially accept the family's insurance plan.

A: That could be one limitation.

Q: Another contingency, if they are self-paid, the ability to pay for any particular program.

A: That could be another one.

Q: What would – another contingency may be location, I'm assuming?

A: That would be correct. Some families are, "Yes, we want them nearby," and others are, "No, we – they need to go somewhere to make new friends and start a new life."

Q: But with those contingencies in mind, if the client says, "I'm not going to go here," you can't force them to go there?

A: No.

Q: They are the final decision maker about where they will go and if they will go?

A: Yes.

*See* Ex. E (Depo. of Karen House) at 64:11-25 to 65:1-12.[5]   Thus, the evidence supports

Defendants' contention that Kyle, and only Kyle, was responsible for deciding whether to extend

his treatment program past the 90-day term.   There is no evidence which suggests that Kyle's

parents played some role in extending the treatment period.  In fact, Plaintiffs admit that Patricia

and Paul concealed from their son the fact that the program could extend past the 90-day period.

Resp. at 10.   Plaintiffs also argue that because Kyle chose treatment at SCTC based on Patricia

and Paul presenting Kyle with the option of selection one of three possible rehabilitation

facilities, the Patricia and Paul were making the decisions, rather than Kyle.   Resp. to Defts'

SOF 15.   The fact that Kyle was limited in the possible choices of *where* to attend does not

refute the fact that Kyle was, in the end, responsible for whether he would attend at all, and

whether he would see the program through.

There is no evidence of an agreement or meeting of the minds regarding an extension of

the treatment period beyond 90 days, based on Kyle's own testimony:

Q: Before the facility announced it was going [to] case operations, what were your

---

[5]  Ms. House is characterized as Defendants' "fact witness" in the brief.   However, Ms. House was Kyle's former
therapist while he was at SCTC, and for a short time after his discharge. *See* Doc. 47 at 14.

plans after the 90-day period?

A: Uhm, I mean I still wasn't sure if I was going to be ready by that time. I could have gone to another halfway house or could have stayed there a couple more days. I was hoping, uhm, that I would have been ready, but I just – I wasn't completely sure at that point. I really wasn't.

Q: Hadn't you already, by that time, made a determination that you were going to Real Recovery?

A: Yes, I had.

Q: And you made that in – that determination in December, right?

A: Yes. But I wasn't sure what date that was going to be at.

Q: Was there anything that had occurred prior to being told at the very beginning of January that the facility was going to cease operations that led you to believe that you were not going to go to Real Recovery at the end of the 90-day period?

A: No. No, there wasn't.

* * *

Q: On page 41 of 59, entry 233, December 21, 2012…and its talking about the wilderness trip, and then also aftercare. Do you see that?

A: Yes.

Q: And it indicates – it's a general discussion your aftercare needs to be decided before your trip because your 90 days comes immediately following the trip. Do you see that?

A: Yes. Yes.

Q: And then it says, "Client is still interested in Real Recovery, however wants to look at his family's other options.

A: Okay.

* * *

Q: Okay. Based on this entry, was it the plan, then, that you would complete your 90 days, which would be including the wilderness trip, and then go to aftercare potentially at Real Recovery?

16

A: Yeah. That's what I understood.

*See* Defts' SOF 15, Ex. B at 95:5-25 to 96:1-15; 148:9-25; 149:1-9.   Kyle's intent is clear from

this testimony: he believed that he was going directly to Real Recovery after the end of the 90-

day treatment term.  If there was another alternative, such as extending treatment at SCTC past

the 90-day term, this alternative was only a *possibility,* and certainly not a result of any meeting

of the minds.   Plaintiffs have failed to present any facts inferring that they could prove the

existence of an implied contract to provide Kyle drug addiction treatment services past the 90-

day treatment term.  Defendants are entitled to summary judgment on Plaintiffs' claim on breach

of implied contract as well.

## IV.    Claims Based on Agency Theory

Plaintiffs allege that TRS and SCTC were the alleged tortfeasors to support their claims

and that Defendant Elements is liable under theories of apparent agency or vicarious liability.

Defendants argue that Plaintiffs' claims against Defendant Elements fail because Plaintiffs are

unable to establish all elements of their IIED and NIED claims as a matter of law, and as a result,

these claims against Defendant Elements also fail.   Based on the Court's foregoing findings that

Defendants are entitled to summary judgment on Plaintiffs' IIED and NIED claims, the Court

also finds that Defendant Elements is entitled to summary judgment on these claims premised on

an agency theory.

**THEREFORE, IT IS ORDERED** that Defendants' Motion for Partial Summary

Judgment on Plaintiffs' Claims of Intentional Infliction of Emotional Distress, Negligent

Infliction of Emotional Distress and Breach of Implied Contract **(Doc. 43)** is hereby GRANTED

for reasons described in this Memorandum Opinion and Order.

_____

UNITED STATES DISTRICT JUDGE