# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

KYLE THISTLETHWAITE,
PATRICIA THISTLETHWAITE, and
PAUL THISTLETHWAITE,

      Plaintiffs,

v.                                                                                    Case No. 14cv00138  WJ/CG

ELEMENTS BEHAVIORAL HEALTH,
INC., a foreign corporation,
TRS BEHAVIORAL CARE, INC.,
d/b/a THE RIGHT STEP,
a foreign corporation, and
SAN CRISTOBAL TREATMENT
CENTER, LLC, a foreign limited liability company,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON PLAINTIFFS' CLAIM OF DAMAGES UNDER BREACH OF CONTRACT

THIS MATTER comes before the Court upon a Motion for Partial Summary Judgment on Plaintiffs' Claim of Damages Under Breach of Contract, filed on February 2, 2015 by Defendants Elements Behavioral Health, Inc. ("Elements"), TRS Behavioral Care, Inc. ("TRS") and San Cristobal Treatment Center, LLC ("SCTC") ("Defendants") **(Doc. 48).**     Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is well-taken and, accordingly, it is GRANTED.

## BACKGROUND

Defendants SCTC and TRS provided drug addiction treatment services to Plaintiff Kyle Thistlethwaite ("Kyle"), the son of Plaintiff Patricia Thistlethwaite ("Patricia") and Plaintiff Paul

Thistlethwaite ("Paul") (hereinafter collectively "Plaintiffs").   Kyle, age 19, enrolled in a voluntary 90 day inpatient drug addiction treatment program beginning October 26, 2012 at SCTC at a cost of $40,000 paid by Patricia and Paul.   Kyle completed and signed all admissions paperwork.  On January 2, 2013, SCTC and TRS announced that SCTC would cease operations and did so five days later on January 7, 2013, 16 days short of the 90-day treatment term. Plaintiffs allege that the closure harmed Kyle physically and emotionally, as the closure improperly interfered with his ongoing drug addiction treatment and that the early closure caused Kyle to relapse.  Finally, Plaintiffs allege that the relapse caused emotional harm to Patricia and Paul.

The complaint asserts nine claims:

Count One:    Breach of Contract
Count Two:    Tortious Interference with Contract
Count Three:  Fraud
Count Four:   Negligent Misrepresentation
Count Five:   Intentional Infliction of Emotional Distress
Count Six:    Negligent Infliction of Emotional Distress
Count Seven:  Medical Negligence
Count Eight:  Negligence
Count Nine:   Unjust Enrichment

Counts Two and Seven have been dismissed on Plaintiffs' unopposed motions.  Docs. 46 and 71.  Thus far, the Court has granted Defendants summary judgment on Counts Five, Six and Eight, *see* Docs. 69 & 70 (Court's Mem. Opin. & Order).     In this motion, Defendants seek summary judgment on Plaintiffs' breach of contract claim in Count I based on the untimeliness of Plaintiffs' response and amended response to Defendants' motion.   However, the Court recently determined that it would not strike Plaintiffs' untimely response to the breach of contract claim, in favor of striking Plaintiffs' responses to two other motions filed by Defendants. *See* Doc. 75.   Alternatively, Defendants seek summary judgment on consequential

damages which Plaintiffs seek under a breach of contract theory, and on any damages sought based on injuries allegedly suffered by Kyle.

## I.      Legal Standard

Defendants are entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The primary purpose of Rule 56 is to determine whether genuine factual issues exist which require resolution by the fact finder such that a trial is necessary.   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  Defendants bear the initial burden of showing the absence of any genuine issues of material fact and entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Store*s, 144 F.3d 664, 670- 71 (10th Cir. 1998).   Defendants can meet this burden by pointing out to the Court that there is an absence of evidence to support Plaintiffs' case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once this burden is met, Plaintiffs must present specific record evidence showing that a genuine issue exists for trial on those dispositive matters on which they have the burden of proof.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990); see Fed. R. Civ. P. 56(c)(1) (the party opposing summary judgment must cite to particular materials in the record to support claims of disputed issues of fact).   A mere "scintilla" of evidence in Plaintiffs' favor is insufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 252.   Summary judgment is properly granted where a rational trier of fact, considering the record as a whole, could not find for Plaintiffs.   *Matusushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## I.      Undisputed Facts

Defendants' statement of undisputed facts ("SOF") is set forth without any dispute presented by Plaintiffs.[1]  The basis of liability against Defendant SCTC under Plaintiffs' breach of contract theory concerns SCTC's act of closing the facility before Plaintiff Kyle Thistlethwaite ("Kyle") completed 90 days of treatment.  The basis of liability against Defendants TRS and Elements under Plaintiffs' breach of contract theory is alleged on the basis of apparent agency, vicarious liability, or direction participation, authorization, or ratification of SCTC's conduct.

Plaintiffs are relying upon the Payment Plan Agreement to support their breach of contract claim. The Payment Plan Agreement notes that Kyle will undergo treatment from October 26, 2012 through January 23, 2013 in exchange for $40,000, and it is signed by Patricia and SCTC.   Ex. 1 to Complaint. Plaintiffs allege that Kyle was an intended third-party beneficiary of the agreement between SCTC and Plaintiffs (Paul and Patricia) and that he suffered physical harm as a result of Defendants' conduct.  Plaintiffs seek "consequential damages against Defendants in addition to the direct damages flowing from Defendant SCTC's breach of the contract."  The consequential damages Plaintiffs seek for an alleged breach of contract include:

- $137,500 for amounts paid for post SCTC drug addiction treatment for Kyle at Real Recovery;

- $60,000 in estimated future amounts for additional drug addiction treatment for Kyle from October 2014 to October 2015;

- $7,500 for a criminal defense attorney related to the arrest of Kyle for possession of methamphetamine and possession of a stolen vehicle; and

- $1,700 for amounts paid to a bonding company following Kyle's arrest.

---

[1]  These facts are supported by attached exhibits.

These consequential damages sought are based upon the closure of SCTC, which Plaintiffs' claim caused Kyle to relapse, leading to further treatment and to an arrest and criminal charges.

On December 25, 2012, before Plaintiffs knew that SCTC was closing, Kyle agreed to attend a sober living aftercare program at a facility called Real Recovery located in North Carolina.  Beginning the first two weeks of December, 2012, Kyle's parents started discussing sober living options for additional treatment after Kyle finished the 90 days, and it was their intent to pay for Kyle's aftercare program.   On April 13, 2013, more than three months after SCTC closed, Kyle was arrested and charged with possession of a stolen vehicle and manufacturing methamphetamine.  Kyle was aware the vehicle was stolen and actively participated in making a "shake-and-bake bottle" containing methamphetamine.

Plaintiffs fail to address any of the above facts head-on.   Their responses are devoid of any specific facts that would create a genuine material dispute and consist mostly of quasi-legal argument based more on "logic" than legal standard.    The Court provides one or two examples to demonstrate this point.   In SOF 1 and 3, Defendants state that Plaintiff's breach of contract theory against Defendant SCTC is based on the Payment Plan Agreement and SCTC's act of closing the facility before Kyle completed 90 days of treatment.   Plaintiffs do not dispute that the contract at issue was for a 90-day treatment plan in exchange for $40,000.  They present no evidence or facts to refute Defendants' facts, but only point out that the Plan offered an "option" of a longer stay, and suggest that there was a "possibility" of a treatment duration lasting longer than 90 days.  Doc. 57 at 2 and 4.    These additional facts do not refute Defendants' SOF 1 and 3.   Defendants characterize Plaintiffs' response as an assertion that Defendants breached an implied-in-fact contract for treatment past 90 days, but an implied-in-fact contract claim would not save a breach of contract claim seeking consequential damages and has no merit on its own.

5

The Court recently entered judgment against Plaintiffs for any breach of implied contract claim they might assert as part of Count I.  *See* Doc. 69 at 13-17 (Court's Mem. Opin. & Order).

As part of their response to Defendants' SOF 1 and 3, Plaintiffs argue that they "also support their claim for breach of contract with allegations that Defendant SCTC violated the implied covenant of good faith and fair dealing by prematurely closing the facility's doors." This statement is non-responsive to Defendants' facts, not only because there are no facts presented as required in a response to a summary judgment motion, but also because relying on a claim of implied covenant of good faith and fair dealing has no bearing on whether Plaintiffs can recover consequential damages under a breach of contract theory, which Plaintiffs must first establish.[2]

As another example, Plaintiffs make no showing or argument that Defendants' SOF 8 is either inaccurate or unsupported.   In SOF 8, Defendants state that "[t]he consequential damages sought are based upon the closure of SCTC, which Plaintiffs' claim caused Kyle' to relapse. . . ." Plaintiffs "take issue" with this fact without offering any facts that dispute it.    Instead, they claim that Defendants ignore the "special circumstances" of Kyle's mental and emotional health at the time of facility's closure which contributed to the extent of Plaintiffs' claimed consequential damages and which also create a genuine factual dispute.   However, Kyle's status at the time SCTC closed its doors does not contradict or disprove SOF 8 which states that Plaintiff's alleged consequential damages are based on the early closure of the facility.

---

[2]   The Court also notes that Plaintiff has not alleged a claim for breach of implied covenant and good faith in the Complaint.   Such a claim requires a plaintiff to show bad faith on the part of a defendant, or that a defendant "wrongfully and intentionally used the contract to the detriment of the other party.   *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 212, 880 P.2d 300, 309 (1994).   This kind of response is fairly typical of all of Plaintiffs' responses to Defendants' statements of facts, in which Plaintiffs' counsel sidesteps the facts at issue and launches into repetitive argument on issues that may be related but are irrelevant.

Defendants' SOF 9 and 10 concern Kyle's intention to attend a sober living program at Real Recovery, and the intention of Kyle's parents to pay for aftercare at the facility.   Plaintiffs' response to each of these facts is at least two pages of legal argument, claiming that Defendants' facts do not take into account Kyle's emotional health and status in the program at the time SCTC close, and that Kyle's parents may have chosen to have Kyle stay at SCTC past the 90-day treatment term for which they contracted.   However, the facts themselves remain undisputed.

## DISCUSSION

Defendants argue that Plaintiffs cannot recover the type of consequential damages they seek, and even if they could, Plaintiffs cannot establish that Kyle's claim of relapse was caused by the closure of SCTC.   The Court notes that Plaintiffs are also alleging direct damages flowing from the alleged breach. *See* Complaint, ¶ 52 ("plaintiffs are seeking consequential damages against Defendants in addition to the direct damages flowing from Defendant SCTC's breach of the contract"); Ex. 1 to Complaint (Payment Plan Agreement indicating that Paul and Patricia T. paid $40,000 in exchange for treatment period from October 26, 2012 through January 23, 2013).

The Court notes that in this motion, Defendants do not seek summary judgment on Plaintiffs' request for direct damages flowing from the alleged breach of contract.[3]

## I.      Consequential Damages Under Contract Theory

Plaintiffs seek consequential damages in two categories:  expenses associated with Kyle's aftercare, or sober living services; and those related to Kyle's arrest and criminal charges. Defendants contend that Plaintiffs have presented no evidence that they are entitled to these expenses under the relevant legal standard.

A.      Legal Standard for Consequential Damages Under Contract Theory

---

[3]   According to exhibits presented by Plaintiffs, Defendant Elements had initially offered Kyle's parents a pro-rated refund for the early closure of the facility, but Paul was "insulted" by the offer.  Doc. 57-4.

In a breach of contract claim, a plaintiff is allowed to recover general damages "that arise naturally and necessarily as the result of the breach" and give plaintiff the value he "would have obtained from the breached contract." *Sunnyland Farms, Inc. v. Central New Mexico Elec. Co-op, Inc*., 301 P.3d 387, 392 (NMSC 2013); U.J.I. 13-843.   The proper test for allowing consequential damages are "only for those consequential damages that were *objectively foreseeable as a probable result* of his or her breach when the contract was made." *Id.* at 393 (emphasis added).   This foreseeability standard is "more stringent than 'proximate cause' in tort law; the loss must have been foreseeable as the *probable* result of breach, not merely a possibility." *Id.* at 392 (emphasis in original); *see also* Restatement (Second) of Contracts § 351 cmt. b ("If loss results other than in the ordinary course of events, there can be no recovery for it unless it was foreseeable by the party in breach because of special circumstances that he had reason to know when he made the contract.").

It is undisputed that the Payment Plan Agreement is silent on any duties owed to any of the Plaintiffs after discharge; however, Plaintiffs are pursuing consequential damages for all amounts paid relating to Kyle's sober living (or "aftercare") program and counseling, future treatment which Plaintiffs believe Kyle require—up to October of 2015; as well as monies spent to hire an attorney and pay a bonding company following an arrest and criminal charges brought against Kyle.

B.     Foreseeability

It is Plaintiffs' burden to establish that the loss they actually incurred was caused by the alleged breach and was objectively foreseeable as a probable result of the alleged breach at the time of contracting.   However, Plaintiffs do not even make an effort to present competent evidence of actual loss.   They are seeking expenses associated with sober living drug addiction treatment services for 2 years and 9 months after the closure of SCTC.   As Defendants note, this is a

8

period of time (from January 2013 through October 2015) that is more than *ten* times longer than the 90-day treatment program at SCTC.    It is undisputed that Kyle agreed to attend a sober living program at Real Recovery in late December, before Plaintiffs knew that SCTC was closing and that Patricia and Paul had intended to pay for this aftercare program after Kyle completed the 90-day program at SCTC.    Thus, Plaintiffs had already planned to bear the expenses for Kyle's aftercare living expenses, yet they are seeking these same expenses as part of the claimed consequential damages.    Plaintiffs make no attempt to tailor their alleged financial loss to what is above and beyond what they expected; instead, they are seeking the full $137,500.00 incurred aftercare expenses and the full $60,000.00 in future estimated after care expenses in consequential damages. *See* Defts' SOF 7 and Pltffs' Am. Resp. at 4, ¶ 4.

There is no evidence that Kyle's relapse and other post-departure experiences could have been foreseen at the time of contracting.    The expenses being sought here are not losses that were objectively foreseeable at the time of contracting.  Since Kyle was already planning to attend Real Recovery following the program at SCTC, and his parents had already agreed to pay for Kyle's aftercare, it is more likely that these treatment expenses would have occurred regardless of the closure of SCTC.   It is not enough for Plaintiffs to argue a "possibility" of such events occurring; Kyle's specific relapses must have been foreseeable.  *See Sunnyland Farms,* 301 P.3d at 394 (consequential damages are only permissible "if the particular damage that *actually* occurred was foreseeable") (emphasis added).

Plaintiffs' causation problems are even more striking with regard to Plaintiffs' claim for consequential damages related to Kyle's arrest.    It is undisputed that Kyle admitted at his deposition that he was arrested and charged with possession of a stolen vehicle and manufacturing methamphetamine.  He stated that he was aware the vehicle was stolen and actively participated in manufacturing methamphetamine in a "shake-and-bake" bottle.  Kyle's

arrest occurred over *three* months after the closure of SCTC.  Plaintiffs cannot show that at the time of contracting, it was objectively foreseeable that Kyle's arrest and prosecution for these criminal offenses—which he knowingly committed—were the probable result of the closure of SCTC.

Plaintiffs insist that the claimed consequential damages were foreseeable but do not offer any evidence to support that contention.   Instead, they rely on "logic."  They argue that one can "assume" that successfully completing the 90-day program at SCTC would have resulted in "some quantifiable benefit" such as a reduction in the amount of additional treatment required in a sober living facility.   Doc. 57 at 11 ("it is reasonable to conclude that completion of a drug rehabilitation program will increase the probability of that person maintaining sobriety, and conversely, it is reasonable to conclude that failing to complete a drug rehabilitation program will decrease the probability of that person maintaining sobriety").   The basis for this contention is not expert testimony, or professional opinion of any kind, but solely Kyle's own subjective belief that he was "not ready" to leave SCTC when it closed.

> I would say I made little steps forward, and I felt that more time there would have been better, . . . I mean, it just fluctuated up and down, which is obvious.  It's just an obvious sign that I wasn't ready.  If it doesn't stay stationary, I mean you're not ready.

Doc. 57-5 at 93:15-20.   Plaintiffs rely on another bit of "logic" in support of their contention that Kyle's relapse was foreseeable, by pointing out a "connection" between illegal drug use and crime:

> One does not have to be a professor of criminology to know that illegal drug users are commonly associated with crime, especially the types of crimes for which Plaintiff Kyle Thistlethwaite was arrested, possession of a stolen vehicle and the illegal manufacture of methamphetamine. This connection between illegal drug use and crime is so strong that Plaintiff Kyle Thistlethwaite's subsequent relapse and arrest after the facility was prematurely closed is objectively foreseeable as a probable result of the early closure if one takes into account his mental health and

history of substance abuse, all of which was available to Defendant SCTC at the
time of contracting.

Doc. 57 at 12.   Unfortunately, Plaintiffs' logic is a far cry from the appropriate legal standard for
foreseeability under a contract theory which is required here.   Plaintiffs contend that Kyle's
"special circumstances" contributed to the extent of the claimed consequential damages (Doc. 57 at
6) but do not identify what these circumstances might be.   They may be arguing that Kyle's mental
and emotional status and his propensities for drug use contributed to his relapse, and that the claimed
consequential damages flow from this relapse.   However, this would be an incorrect application of
the relevant legal standard which requires not only that Kyle's relapse was foreseeable, but that the
types of consequential damages sought were "objectively foreseeable as the probable result" at the
time of contracting.   *See Sunnyland Farms,* 301 P.3d at 392.

Plaintiffs present no evidence or testimony that at the time of contracting, both parties were
aware that Kyle was not going to meaningfully participate in the program until close in time when
the closure was announced and that early closure of SCTC would result in Kyle's "downward spiral."
Kyle's belief that he was "not ready" does not constitute evidence that his relapse was "objectively
foreseeable" and is not sufficient to create a factual dispute suggesting that foreseeability has been
shown.   It was *possible* that Kyle would seek sober living and counseling treatment for almost three
years after the closure of SCTC; it was also *possible* that Kyle would knowingly commit crimes and
be arrested and charged with such crimes three months after the facility closed, but these losses were
certainly not "objectively foreseeable as the *probable* result" of the closure of SCTC at the time of
contracting, and Plaintiffs have presented no evidence to the contrary.   The Court understands that an
individual with a length history of substance dependency and abuse may relapse from a drug
treatment program.   However, the fact that a relapse may occur does not satisfy the legal
foreseeability requirement in a claim for consequential damages flowing from a breach of contract.
*See Sunnyland Farms, Inc.,* 301 P.3d at 392 (". . . the loss must have been foreseeable as the

*probable* result of breach, not merely as a possibility"). Here, one cannot reasonably say that the events which followed the early closure of SCTC were the *probable* result of SCTC closing its doors 16-days shy of Kyle's 90-day program. Further, the occurrence of Kyle's relapse in and of itself does not satisfy the specificity required to meet the foreseeability test. Here, the claimed loss is based on two "relapses" Kyle had following his release from SCTC and which involved Kyle (by his own admission) violating the rules of the sober living facility by drinking regularly and as a result, being kicked out. It is not objectively reasonable to expect that the parties, at the time of contracting, foresaw that this conduct was "probable" in the event SCTC shut its doors before Kyle's 90-day program ended. *See* Restatement (Second) of Contracts § 351 (1981) ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that *actually* occurred was not foreseeable").

For these reasons, Defendants are entitled to summary judgment on Plaintiffs' claims of consequential damages.

## II.    Causation and Kyle's Relapse

Defendants further argue that even if the Court were to accept that Plaintiffs could seek consequential damages that flowed from Kyle's relapse, Plaintiffs still cannot support a breach of contract theory and damages based on any physical injury Kyle suffered.

It is undisputed that Kyle is seeking damages for his alleged personal injuries in contract under a third-party beneficiary theory. Defts' SOF 5 & 8. In *Flores v. Baca*, 117 N.M. 306 (1994), the New Mexico Supreme Court discussed the available causes of action of a third-party beneficiary for a breach of a services contract. The court noted that:

> when a promisor's misfeasance in the performance of a contract foreseeably may cause personal injury to an intended third-party beneficiary, the latter would have a cause of action in both tort and contract for personal injuries proximately caused by the misfeasance…The reason the promise or third-party beneficiary would have a cause of action in tort and contract is that the duty of the promisor arises

both from a common-law duty to exercise ordinary care for the safety of the person of others and from an implied term of contract to render services with reasonable skill and care.

117 N.M. at 310.   New Mexico affords a dual contract and tort remedy for intended third-party beneficiaries.  In *Leyba v. Whitley,* the New Mexico Supreme Court discussed the scope of duty owed in the context of attorney malfeasance, and found that "[a]s with any service contract, an implied term of an attorney's contract to provide *professional services* for the benefit of a third-party is the *promise to render services with reasonable skill and care.*"  120 N.M. 768, 771 (1995).  The court recognized that the duty of an attorney to an intended third-party beneficiary was the same whether based on contract or tort, and held that "when the attorney's conduct falls below the standard of care, liability for legal malpractice will attach").

Plaintiffs are suing Defendants relative to a breach of an agreement between them to provide services to Kyle, the third-party beneficiary of the agreement.   The theory of recovery is premised on allegations that failure to provide the full 90 days of treatment caused Kyle to suffer a relapse.  The Court agrees with Defendants that the contract provides for professional services to be provided to Kyle and that a breach of this contract involves an inquiry into whether professional services were rendered with reasonable skill and care.  Thus, in order to establish liability for a breach of contractual duty owed to an intended third-party beneficiary who suffers a physical injury, Kyle must show a breach of duty by Defendants' failure to render professional services with reasonable skill and care.  *Leyba,* 120 N.M. at 771; *New Mexico Pub. Sch. Auth. v. Arthur J. Gallagher & Co.,* 145 N.M. 316, 322 (2008) (standard of care is measured by the knowledge, skill and care of "reasonably well-qualified professionals practicing under similar circumstances"); *see also Arthur J. Gallagher & Co*., 145 N.M. 316, 322 (2008); *Diaz v. Feil*, 118 N.M. 385, 387 (Ct.App.1994) (New Mexico permits medical negligence claims based on

13

contract or tort and makes no distinction between the two in relation to a plaintiff's burden of proof).

Plaintiffs' only response on this issue is that Defendants are wrong to apply a professional services breach standard to this case because New Mexico's Medical Malpractice Act ("Medical Malpractice Act") does not recognize drug addiction treatment facilities as health care providers, and thus Plaintiffs do not need expert testimony to provide an opinion about the standard of care in a drug addiction treatment facility. *See* NMSA 1978, §41-5-5. Plaintiffs offer no argument to rebut Defendants' position on this issue. First, Plaintiffs cannot have it both ways. Plaintiffs have consistently premised their legal theories on Defendants' alleged failure to consider Kyle's emotional health and vulnerabilities, his history of suicide attempts and abandonment issues,[5] only to reverse course and now contend that they are not bound by the burden of proof to establish professional negligence.

Second, the fact that drug addiction treatment facilities are not included in the definition of a "health care provider" under the Medical Malpractice Act does not mean that Defendants were not providing "professional services." The Act has no significance here except to denote that Defendants would not have the benefit of any of the provisions of the Act in the event they were sued for malpractice. *See* NMSA 1978, §41-5-5(C) ("A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the Medical Malpractice Act in the event of a malpractice claim against it.").

Third, Plaintiffs had nothing to say in response to facts raised in Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims of Negligence, in which Defendants outlined

---

[5]  Plaintiffs contend that Kyle was extremely vulnerable at the time of the announced closure as he had a history of three attempted suicides, hard drug abuse, and was additionally "plagued by trust and abandonment issues stemming from his adoption" by his parents.   Doc. 57 at 6.

the legal basis for applying a professional negligence standard to Plaintiffs' claims seeking damages based on Kyle's alleged injuries. *See* Doc. 47, SOF 4 through 9. Those facts establish that Plaintiffs have withdrawn the medical negligence claim that was initially alleged; that they did not intend to use an expert witness on any of the remaining claims, and that Kyle's former therapist, Karen House, was disclosed as a lay witness in discovery. These facts remain undisputed and are adopted herein as well. *See* Fed.R.Civ.P. 10(c) (adopting statement in pleading elsewhere in same pleading or any other pleading). Moreover, in their response Defendants' Motion to Strike Expert Testimony (Doc. 50), Plaintiffs conceded that expert testimony from Ms. House would be properly excluded under the Federal Rules of Civil Procedure, and that her testimony would be introduced solely as lay testimony. *See* Doc. 75 at 4-5.[6]

The final blow to Plaintiffs' contract claim based on any physical injury Kyle suffered comes in the form of the Court's recent decision which granted summary judgment to Defendants on their Partial Summary Judgment regarding Kyle's claim of negligence. Doc. 70 (Mem. Op. & Order).

In granting the Motion, the Court applied a professional negligence standard of care and found that Plaintiffs lacked evidence that was essential to establish the elements of a professional negligence claim. *Id.* The Court determined that despite Plaintiffs' framing of the claim as an ordinary negligence claim, the claim was actually a professional negligence claim which required expert testimony to provide evidence of a breach in the standard of care. *Id.* at 9-11. Plaintiffs' claim for damages based on Kyle's alleged injuries faces the same obstacles, and fails for the same reasons.

---

[6] Plaintiffs conceded the same regarding the testimony of John Tucker, the Executive Director of SCTC. Doc. 75 at 4-5.

Accordingly, as a matter of law, Plaintiffs lack evidence to establish elements of claims alleging to injury to Kyle under their breach of contract theory in Count I, and the Court finds in favor of Defendants on this claim.

### CONCLUSION

In sum, the Court finds and concludes that Plaintiffs are not entitled to consequential damages associated with Kyle's relapse that were allegedly caused by the closure of SCTC. Such losses were not "objectively foreseeable as the probable result" of the closure of SCTC at the time of contracting, and Plaintiffs have presented no evidence to the contrary.   Thus, partial summary judgment shall be entered in favor of Defendants on Plaintiffs' claims for consequential damages under their breach of contract theory in Count I.

In the alternative, the Court also finds and concludes that Plaintiffs have presented no evidence on the elements of their claims alleging injury to Kyle under their breach of contract theory in Count I, and for this reason, Defendants are entitled to summary judgment on this aspect of Count I.

Finally, the Court notes that its findings herein did not address, and do not affect, Plaintiffs' claims for direct damages flowing from the alleged breach of contract and thus, this part of Plaintiffs' claim remains intact.  Consequently, this Order does not entirely dispose of Plaintiffs' breach of contract claim in Count I.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claim of Damages Under Breach of Contract **(Doc. 48)** is hereby GRANTED for reasons described in this Memorandum Opinion and Order**.**

_____
**UNITED STATES DISTRICT JUDGE**