UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KYLE THISTLETHWAITE,
PATRICIA THISTLETHWAITE, and
PAUL THISTLETHWAITE,

    Plaintiffs,

v.                                                    Case No. 14cv00138   WJ/CG

ELEMENTS BEHAVIORAL HEALTH,
INC., a foreign corporation,
TRS BEHAVIORAL CARE, INC.,
d/b/a THE RIGHT STEP,
a foreign corporation, and
SAN CRISTOBAL TREATMENT
CENTER, LLC, a foreign limited liability company,

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS OF FRAUD, NEGLIGENT MISREPRESENTATION AND PUNITIVE DAMAGES

THIS MATTER comes before the Court upon Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims of Fraud, Negligent Misrepresentation, Tortious Interference with Contract, Agency and Punitive Damages, filed February 4, 2015 **(Doc. 49)**. Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is well-taken and shall be granted, with the exception of Plaintiffs' tortious interference claim which was dismissed previously by stipulation of the parties. *See* Doc. 71.

### BACKGROUND

Defendants SCTC and TRS provided drug addiction treatment services to Plaintiff Kyle Thistlethwaite ("Kyle"), the son of Plaintiff Patricia Thistlethwaite and Plaintiff Paul Thistlethwaite (hereinafter collectively "Plaintiffs"). Kyle, age 19, enrolled in a voluntary 90-

day inpatient drug addiction treatment program at San Cristobal Treatment Center ("SCTC") beginning October 26, 2012 at a cost of $40,000 paid by his parents. Kyle completed and signed all admissions paperwork. On January 2, 2013, SCTC and TRS announced that SCTC would cease operations and did so five days later on January 7, 2013, 16 days short of the 90-day treatment term. Plaintiffs allege that the closure harmed Kyle physically and emotionally, as the closure improperly interfered with his ongoing drug addiction treatment and that the early closure caused Kyle to relapse. Finally, Plaintiffs allege that the relapse caused emotional harm to Patricia and Paul. The complaint asserts nine claims:

Count One:     Breach of Contract
Count Two:     Tortious Interference with Contract
Count Three:   Fraud
Count Four:    Negligent Misrepresentation
Count Five:    Intentional Infliction of Emotional Distress
Count Six:     Negligent Infliction of Emotional Distress
Count Seven:   Medical Negligence
Count Eight:   Negligence
Count Nine:    Unjust Enrichment

Most of these claims have been resolved, either by the Court's rulings or by the parties' stipulations. Counts Two and Seven have been dismissed on Plaintiffs' unopposed motions. Docs. 46 and 71. The Court has granted Defendants' partial summary judgment on Counts Five, Six and Eight. *See* Docs. 69 & 70. The Court also granted partial summary judgment in favor of Defendants on Plaintiff's breach of contract claim in Count One but noted that Plaintiffs' claims for direct damages flowing from the alleged breach of contract remain intact. Doc. 76. In addition, the Court recently struck Plaintiffs' responses, Docs. 63 and 64 for untimeliness. One of these pleadings is the response to the instant motion. *See* Doc. 75. The parties have also agreed to the dismissal of Plaintiff's Count Two, asserting tortious interference with contract, on which Defendants seek dismissal in this motion. *See* Doc. 71. What remains now

are Counts Three, Four and Nine alleging Fraud, Negligent Misrepresentation, and Unjust Enrichment.  Defendants have not moved for dismissal on Plaintiffs' Unjust Enrichment claim.

In this last motion in the series, Defendants seek partial summary judgment on Plaintiffs' claims of Fraud, Negligent Misrepresentation, Agency and Punitive Damages.  As noted, the Court need not consider Defendants' discussion on Plaintiff's tortious interference claim because it has been dismissed on the parties' stipulation.

**I.      Legal Standard**

Defendants are entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The primary purpose of Rule 56 is to determine whether genuine factual issues exist which require resolution by the fact finder such that a trial is necessary.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Defendants bear the initial burden of showing the absence of any genuine issues of material fact and entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670- 71 (10th Cir. 1998).  Defendants can meet this burden by pointing out to the Court that there is an absence of evidence to support Plaintiffs' case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once this burden is met, Plaintiffs must present specific record evidence showing that a genuine issue exists for trial on those dispositive matters on which they have the burden of proof.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); see Fed. R. Civ. P. 56(c)(1) (the party opposing summary judgment must cite to particular materials in the record to support claims of disputed issues of fact).   A mere "scintilla" of evidence in Plaintiffs' favor is insufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 252.  Summary judgment is properly granted where a rational

trier of fact, considering the record as a whole, could not find for Plaintiffs. *Matusushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As a result of the Court's striking of the response, there is no response the Court needs to consider. Without a response to a Rule 56 motion, a nonmoving party waives the right to file a response and confesses all facts asserted and properly supported in the motion. *Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 (10th Cir. 2002). This means that if Defendants as movants satisfy their burden of showing that no material issues of fact exists and present evidence to support those facts, Defendants are entitled to summary judgment. *Id*.; *see also* D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion").

## II.     Undisputed Facts[1]

In October of 2012, a decision was made by Patricia Thistlethwaite ("Patricia T") and Kyle Thistlethwaite ("Kyle") that Kyle should go back into treatment. Patricia T. testified that in looking at the available websites for San Cristobal, SCTC offered a 90-day program, which could be extended. Patricia T. and Kyle called SCTC about the program and during the call, the length of the program was discussed as being 90 days. During this call, Patricia T. was quoted a price for a 90-day program, and was never quoted a price for anything beyond 90 days. After this telephone call, Kyle agreed to attend the SCTC program.

The only contact or communications Patricia T. had before Kyle started the program at SCTC was information she obtained on the website, the telephone conversation with SCTC, and email communications. In those contacts, Patricia T. was advised that Kyle would receive a 90-day program, unless he left. No one expressed to Patricia T. that SCTC would not close for any reason at all. Paul T. testified that he did not speak with anyone at SCTC, TRS, or Elements

---

[1] These facts are supported by exhibits attached to Defendants' motion.

before Kyle started the program. He also stated that he was not involved in the early investigation process in finding a treatment program. Paul T. testified that by the time he became involved in the process, Kyle had already made the decision to go to SCTC.

Kyle signed himself into the program at SCTC on October 26, 2012. He testified that he believed misrepresentations were made primarily to his parents through the website. Kyle was told that the SCTC program was a 90-day program, and he testified that Defendants never told him that under no circumstances would the program end before the 90-day period. All Plaintiffs claim that they "were led to believe through Defendants' advertisements and communications that the treatment facility would at least include a full 90 days of treatment." *See* Plaintiffs' Answers to First Set of Interrogatories, No. 11, attached hereto as Exhibit D.

Plaintiffs claim that they "were led to believe through Defendants' advertisements and communications that the treatment program would not be cancelled or abrogated in any way unless it was a result of the fault of Plaintiff Kyle Thistlethwaite." Exhibit D. Paul and Patricia T. claim they were "led to believe by Defendants' advertisements and communications that the treatment could extend an additional 90 days or more, if necessary." *Id.*

SCTC is a wholly owned subsidiary of TRS and TRS is the sole member of SCTC. Elements is the majority owner of TRS. *See* Affidavit of Steven Spitz (Doc. 1-2.), and Ex. F. In late November of 2012, Elements and TRS began discussions about the future of SCTC. *See* TRS' Answer to Interrogatory No. 7, attached to Ex. E, and Affidavit of David Sack, attached to Ex. F. At that time, it was unknown whether SCTC would close or continue operations. Exs. E & F. By December 16, 17, or 18, 2012, TRS had no knowledge that SCTC would be closing, and was not aware that SCTC would close until December 21, 2012. Ex. E & F.

On or about December 16, 17 or 18, 2012, John Tucker, the Executive Director of SCTC, was asked by TRS to stop accepting new patients, but he was not told that SCTC was closing at that time.  *See* Ex. G (Tucker Depo.) at 31:2-25, 32, 33, and 34:1-19 and Ex. E.  This act led Mr. Tucker to believe SCTC might be closing, but he was not told that SCTC was closing, and he had never had this belief until mid to late December of 2012.  Ex. G, pp. 35:21-25 and 36:1-12.

On December 21, 2012, the decision was made to close SCTC and at that time, TRS was advised that SCTC would close.  Exs. E & F.  Julie Denofa of TRS advised the staff at SCTC and the families of the clients of SCTC of the decision to close on January 2, 2013, and advised the clients of SCTC of the decision to close on January 3, 2013.  Ex. E; Ex. G at 37:20-25 and 38:1-4.  The decision to close SCTC was made by David Sack "as board member and President of EBH, TRS, and SCTC in consultation with other members of management."  *See* Elements' Ans. to Interrog. No. 19, attached to Exs. H; Ex. F.  John Tucker testified that he was provided "general information" as to why SCTC closed, and was told that the "board of directors" made the decision to close because "San Cristobal doesn't fit into the ongoing vision of the company." Ex. G, at. 60:16-25 and 61:1-6.  Karen House, Kyle's therapist during the program, testified about three reasons she was told SCTC closed, which were: (1) an unwillingness to spend money on costly expenditures to bring the SCTC program up to the Joint Commission accreditation standards, (2) finances because the SCTC program "never broke even," and (3) the remote location of SCTC.  House Depo., Ex. 1 at 51:11-25, 52, 53, and 54:1-14.

Before Kyle started the program at SCTC on October 26, 2012, no one at SCTC, TRS, or Elements had any knowledge or suspicion that SCTC would close.  Ex. F.

**DISCUSSION**

Defendants contend that Plaintiffs cannot prove the essential elements of fraud or negligent misrepresentation, or of any of their claims against Elements under a theory of agency or vicarious liability. Defendants also seek summary judgment on Plaintiffs' punitive damages claim.

**I.     Fraud and Negligent Misrepresentation Claims**

Plaintiffs claim that Defendants made three representations: (1) the SCTC program would last 90 days, (2) the SCTC program could be extended beyond the 90-day period, and (3) the SCTC program would not be cancelled or abrogated in any way unless it was a result of the fault of Kyle.

To prove a claim of fraud, Plaintiffs must show by clear and convincing evidence: (1), a representation of fact was made which was not true, (2) either the falsity of the representation was known to the party making it or the representation was recklessly made, (3) the representation was made with the intent to deceive and to induce [Plaintiffs] to rely on the representation, and (4) Plaintiffs did in fact rely on the representation. *See* NM UJI 13-1633; *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 124 N.M. 549, 562 (1998).

To prove a claim of negligent misrepresentation, Plaintiffs must establish the following elements: (1) Defendants made a material misrepresentation of fact to Plaintiff[s], (2) Plaintiff[s] relied upon such representation, (3) Defendants knew the representation was false at the time it was made or made the representation recklessly, and (4) Defendants intended to induce Plaintiff[s] to rely on such representation." *Healthsource Inc. v. X-Ray Assoc. of N.M.*, 138 N.M. 70, 79 (2005); *see* NM UJI 13-1632 ("A material misrepresentation is an untrue statement…" and "negligent misrepresentation is one where the speaker has no reasonable ground for

7

believing the statement made was true."). Unlike fraud, Plaintiffs must establish negligent misrepresentation "by a preponderance of the evidence." *Eckhardt,* 124 N.M. at 562. Additionally, a negligent misrepresentation claim can be established upon a showing of an untrue statement, or upon a showing of "information which, while true as it goes, is incomplete in a material respect and therefore misleading." *See* UJI 13-1632, committee commentary, and *Eckhardt,* 124 N.M. at 562 ("[N]egligent misrepresentation may involve a statement that is 'literally true,' but misleading.").

A.	Evidence Relating to Fraud and Negligent Misrepresentation Claims

For both the fraud and negligent misrepresentation claims, Defendants must have known that the representation made to Plaintiffs was false at the time Plaintiffs relied on that representation. Also for both claims, in order to determine whether untrue representations were made which ultimately induced Kyle to attend the SCTC program and to induce his parents to pay for the program, the focus must be on any written or verbal statements made by Defendants to Plaintiffs at the time Plaintiffs first contacted SCTC or TRS.

According to Defendants' facts, which are undisputed, there is no evidence that any one associated with Elements, TRS or SCTC had any knowledge that SCTC would close in January of 2013 at the time that Patricia T. started her investigation into the SCTC program in October of 2012. Elements did not acquire TRS, which operated SCTC, until August 2012, and at that time the expectation was that all entities operating under TRS, including SCTC, would continue operating. David Sack, President and CEO of elements, President of TRS, and President of SCTC, stated in his affidavit that discussions regarding the viability of SCTC's operations were questioned for the first time in late November 2012, and at that point it was "unknown" whether SCTC would close or continue operations. *See* Doc. 49-6 at 2. SCTC was instructed by TRS

to stop accepting new patients in mid-December 2012, and at that point it was still undecided whether SCTC would close or continue operations. *Id.*  It is undisputed, and conceded by Plaintiff, that the decision to close was not made until December 21, 2012.  Doc. 49-6 at 2.

John Tucker's testimony corroborates the statements made by David Sack in his affidavit. During a telephone conference with TRS representatives Jonathan Ross and Julie Denofa on December 16th or 17th, 2012, Tucker was told that the Elements board of directors was meeting that week to decide how SCTC "was going to fit into the . . . the larger corporation" and that until that issue was decided, SCTC was not to accept any new clients. Ex. G at 33:16-25; at 34:1-4.  Until that mid-December telephone call, Tucker had not been instructed to stop taking new patients. *Id.* at 34:8-12.  Tucker was not told during that phone call, or anytime prior to the call that the facility would close, nor did Tucker have any belief that it would. *Id.* at 34:15-18; 36:5-12.  The first time Tucker found out that SCTC would close was on January 2, 2013, when Julie Denofa visited Taos to tell tucker personally. Ex. G at 37-38.  Although TRS' initial plan was to release all the patients by January 4th, Tucker convinced Mr. Ross and Ms. Denofa to allow the six to eight patients to stay until January 7th. *Id.* at 40:1-20.

This testimony supports the facts presented by Defendants, and their position that Defendants did not know the facility would close at the time Plaintiffs entered into the contract. They could not misrepresent what they did not know would happen.

B.   Plaintiffs' Response

In the interest of equity, the Court has reviewed Plaintiffs' response even though it has been stricken in order to make certain that justice and fair play does not give way to the harsh

9

consequences of technical rule violations. However, this review has reassured the Court that the evidence presented by Defendants has not been refuted in any way.[2]

Plaintiffs contend that the very facts presented by Defendants reasonably infer that closure of SCTC was not "unknown" to Defendants. The response reiterates two points: (1) the length of the 90-day program and options for extension; and (2) Defendants' knowledge in late November regarding the option of early closure of the facility. However, the undisputed facts cannot be viewed to support the inferences desired by Plaintiffs. First, in order to salvage claims of fraud or negligent misrepresentation, Plaintiffs are required to present evidence that Defendants made a misrepresentation that they either knew was false, or recklessly made the misrepresentation (for negligent misrepresentation) or did so with an intent to deceive (for fraud). The expectation that Kyle's parents may have had that Kyle would complete the 90-day program at SCTC, and their awareness of options to extend the program, is not evidence that Defendants were aware at the time that Kyle would not be able to complete a 90-day stay because the program was in danger of closing. There is no evidence at all that Plaintiffs' reliance on these expectations was based on statements that were untrue or known not to be true at the time the contract terms were discussed.

Second, Plaintiffs argue that if Defendants were concerned about SCTC's viability in late November, they must also have known that early closure of the facility was an option. Plaintiffs contend that in late November 2012, when SCTC's viability first became an issue, Defendants had to know that the closure of SCTC was a "likely possibility at the time the statement was made." Doc. 49 at 9. The problem is that there is nothing to back up this argument except for evidence presented by Plaintiffs that Defendants continued to take Plaintiffs' payments into

---

[2] Had such evidence been presented, the Court would have been inclined to sua sponte reconsider its decision to strike Plaintiffs' response to the motion.

December, with the last installment on Dec 7, 2012.  *See* Ex. 7.   This evidence does not contradict Defendants' facts at all because it does not refute testimony that the late November executive discussions were confined to the viability of SCTC and did not consider closure.  More importantly, it has no bearing on any statements or misrepresentations that were made in late October, which is the time Plaintiffs entered into the contract and would have been the time they relied on any statements that were made.[3]

Thus, Plaintiffs fail to withstand summary judgment even if the Court were to reconsider striking Plaintiffs' response and formally consider the pleading.  Plaintiffs do not present any evidence to suggest Defendants knew that SCTC's closure was imminent at the time Plaintiffs entered into contract with SCTC.  There are no contradicting affidavits from other individuals who might have been present at these "discussions," or minutes from these meetings which might refute the statements made by either John Tucker or David Sack.  The Court is not necessarily suggesting that such evidence was or is available, and points this out only to demonstrate what kind of evidence would have been required in order to preclude summary judgment, but which is lacking here.   The Court cannot consider evidence that does not exist.  Also, the Court emphasizes that even an inference that Defendants had decided to close SCTC by late November would not save Plaintiff's fraud and negligent misrepresentation claims, because what Defendants knew in November is not evidence of what they knew or might have known in October when representations about the program were made to Plaintiffs.

Last, it does not help Plaintiffs' position when counsel mischaracterizes the evidence.  Plaintiff's counsel claims that Mr. Tucker stated that when he knew SCTC was operating in the

---

[3]  Payments were made on December 4, 2012 for $8,000; on December 5, 2012 for $7995; and on December 6, 2012 for $4005. Doc. 63-7 at 4-6.    Thus, even if there was proof that Defendants knew about SCTC's closure in late November and still continue to accept Plaintiffs' payments, the most Plaintiffs could recover based on that fact would probably be the installments made after Defendants knew the closure was certain, with some consideration to any benefit Kyle received in the interim.

red, he "needed to admit the patients that had already been accepted." Doc. 63 at 13 (citing to Doc. 13-3, Tucker Aff., ¶¶112-13). However, Tucker's *actual* statement was that SCTC was operating in the red and required new patients." Doc. 13-3, ¶12. He also stated that while SCTC *needed to admit patients* that had been accepted, he was instructed by Jonathan Ross and Julie Denofa to "turn away" patients that had been accepted "pending a decision from Elements' Board of Directors." ¶¶13-14. Plaintiffs' spin on Tucker's statement makes it seem as though SCTC continued to take patients that had been accepted even after there was concern about the program continuing, when Tucker's affidavit states just the opposite—that SCTC was instructed to turn these patients away once Defendants knew these patients might not be able to complete the program.

Because Plaintiffs have not presented evidence on the essential elements of claims for fraud and negligent misrepresentation in Counts Three and Four, the Court finds in favor of Defendants in their summary judgment motion on those claims.

**III.   Agency Theories**

All of Plaintiffs' claims have been dismissed, based on the Court's findings herein and in the Court's previous decisions, except for the breach of contract claim for direct damages flowing from the breach (Count One) and unjust enrichment (Count Nine). Defendants have not moved to dismiss either claim on summary judgment. With regard to these remaining claims, then, Plaintiffs allege that Defendant Elements is liable for the tortious conduct of its subsidiaries, Defendants TRS and SCTC, under theories of apparent agency or vicarious liability.

A.   <u>Relevant Law</u>

New Mexico recognizes the general rule that "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity." *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358,

1362 (10th Cir. 1974); *Scott v. AZL Resources, Inc.*, 107 N.M. 118, 121 (1988) ("A subsidiary and its parent corporation are also viewed as independent corporations."). Exceptions to this rule can be shown through evidence establishing agency or alter ego theory. Under an alter ego theory, a court may pierce the corporate veil and deem the subsidiary the alter ego of the parent "if the parent's control of the subsidiary goes beyond that normally exercised by a majority shareholder, and is 'so complete as to render the subsidiary an instrumentality of the parent.'" *Jemez Agency, Inc. v. Cigna Corp.*, 866 F.Supp. 1340, 1343 (D.N.M. 1994). In New Mexico, to pierce the corporate veil, Plaintiffs must satisfy three elements: "a showing of instrumentality or domination, improper purpose and proximate causation." *Scott,* 107 N.M. at 121. A showing of "instrumentality" or "domination" requires "proof that the subsidiary. . . was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but it functioned instead under the domination and control and for the purposes of some dominant party." *Id*. A showing of "improper purpose" requires proof "that recognition of a separate corporate existence of the two corporations would sanction fraud or other improper purposes." *Id*. Lastly, Plaintiffs must demonstrate that the acts of domination and improper purpose were the cause of the claim of injury. *Id*.

New Mexico has not addressed an agency theory in the context of a parent corporation's liability but the analysis is similar to an alter ego analysis. *See Alto Eldorado Partnership v. Amrep*, 138 N.M. 607 at 614 (2005) ("Agency and alter ego might require a separate analysis when used to assert liability over a foreign corporation, but 'it is difficult to see a significant distinction between the two theories for jurisdictional purposes'"). A parent corporation may be found liable under agency theories where domination is so complete and interference so obtrusive that by general rules of agency, "the parent will be a principal and the subsidiary an

agent." *See Hess v. L.G. Balfour Co., Inc.* 822 F.Supp. 84, 87 (D.Conn. 1993) (citing *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 403 (1960).

The Court agrees with Defendants that Plaintiffs have not developed any evidence to support liability of Elements for any alleged wrongful acts of SCTC or TRS under either an agency or an alter ego theory.   TRS was the entity responsible for the operations of SCTC. Doc. 49-6, Ex. F, ¶ 5 (Sack Aff.).   Also, all staff members of SCTC were employees of TRS. SCTC was controlled and operated by TRS.  Doc. 15 (Denofa Aff).   There is no evidence that Elements exerted complete domination or control over TRS or SCTC; no evidence of an "improper purpose"; and no evidence that SCTC or TRS was not operated in a legitimate fashion.   Plaintiff's response, were the Court to consider it, offers literally nothing more than one sentence stating that:

> Defendants have failed to support their argument for summary judgment on Plaintiffs' claims against Defendant Elements under an agency theory or vicarious liability by citing to particular parts or materials in the record, or by showing that Plaintiffs cannot produce admissible evidence to support their position.

*See* Doc. 63 at 17.   Plaintiffs venture no further than this in their response, and they point to no admissible evidence that *does* support their position.   In the absence of evidence refuting Defendants' undisputed facts, Defendant Elements is entitled to summary judgment against Plaintiffs for all claims against it based upon allegations of agency or vicarious liability. *Blauwkamp v. University of New Mexico Hosp.*, 114 N.M. 228, 232 (Ct.App. 1992) (summary judgment is proper when "the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).

**IV.     Punitive Damages**

Plaintiffs seek punitive damages against all Defendants relative to their remaining claims. on the basis of allegedly "reprehensible conduct" on the part of SCTC or TRS, or both, for which Elements can be liable for under a theory of apparent agency or vicarious liability.

A.      General Standard for Punitive Damages

Punitive damages may be awarded only "when the conduct of the wrongdoer may be said to be maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiff's rights."  *Hood v. Fulkerson*, 1985-NMSC-048, ¶ 16, 102 N.M. 677, 680, 699 P.2d 608, 611.  The purpose of punitive damages is to "punish the wrongdoer and to deter the wrongdoer and others in a similar position from such misconduct in the future." *Conant v. Rodriguez*, 113 N.M. 513, 517 (Ct.App.1992).  In a breach of contract context, New Mexico law allows a recovery for punitive damages if the wrongful conduct at issue is "sufficiently malicious, oppressive, fraudulent, or committed recklessly with a wanton disregard for the plaintiffs' rights." *Bogle v. Summit Investment Co., LLC*, 137 N.M. 80, 90 (Ct.App. 2005) (*citing Paiz v. State Farm Fire & Cas. Co*., 118 N.M. 203, 210 (1994)).   In a breach of contract action, an intentional breach is not enough to warrant a punitive award "even when the breach is flagrant" meaning that "there is no question that the conduct breaches the contract," or when "the other party will clearly be injured by the breach." *Bogle*, 137 N.M. at 90.  Rather, punitive damages in a breach of contract action might be appropriate for cases involving "an intentional breach accompanied by fraud," or "when the breaching party intends to inflict harm on the non-breaching party or engages in conduct which violates community standards of decency." *Bogle*, 137 N.M. at 90 (citing to *Romero v. Mervyn's*, 109 N.M. 249, 258 (1989)).

Even if Plaintiffs could establish an intentional breach of contract in that SCTC intentionally did not offer drug addiction treatment services to Kyle after January 7, 2013, there is no evidence that such an alleged intentional breach was accompanied by fraud, or evidence of the culpable mental state required for punitive damages. *Cmp. Bogle,* 137 N.M. 80 (punitive damages appropriate where defendant breached its contract with plaintiff and purposely took commission owed to plaintiff in order to be able to cover potential claim from third-party in real estate transaction regarding an unpaid commission). Plaintiffs point to no individual or employee of any of the Defendants who committed any action with the requisite reckless or intentional mental state.

B.   Punitive Damages Against Corporations

Plaintiffs seek punitive awards against two corporations and a limited liability company, and so even assuming there was evidence of a culpable mental state on the part of an individual, Plaintiffs would still have to satisfy their burden of proof for an award against a corporate entity. *See Bourgeous v. Horizon Healthcare Corp*., 117 N.M. 434, 437 (1994) ("A corporation can act only through its officers and employees, and any act or omission of an officer or an employee of a corporation, within the scope or course of his or her employment, is an act or omission of the corporation. . . [However] officers or employees of corporations can be held personally liable when they commit intentional torts."). In New Mexico:

> a corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages.

*Chavarria v. Fleetwood Retail Corp.,* 140 N.M. 478, 486 (2006).   Defendants' brief describes each of these bases for liability in detail. Doc. 49 at 19-21. Under a managerial capacity theory,

16

a corporation can be subject to a punitive award "for the wrongful acts of employees who are acting within the scope of employment and who are employed in a managerial capacity." *Chavarria,* 140 N.M. at 486. Under a corporate authorization, ratification, or participation theory, "[a] corporation may be liable for punitive damages for the fraudulent acts of an employee where the corporation in some way authorizes, ratifies, or participates in that fraudulent conduct." *Id.* at 488. The "cumulative conduct" theory relies on the "cumulative conduct of employees" to establish a culpable mental state of the corporation. *See Clay v. Ferrellgass, Inc.,* 118 N.M. 266 (1994).

Defendants contend that Plaintiffs have no evidence to prove the elements of a punitive damages claim against Defendants Elements, TRS, or SCTC based on any of these theories of corporate liability. The Court agrees with this assessment, but again turned to Plaintiffs' brief to determine if there was anything resembling a response that would preclude summary judgment on the punitive damages issue, but here again, Plaintiffs' response consists of one sentence:

> Defendants have failed to support their argument for summary judgment on Plaintiffs' claims for punitive damages by citing to particular parts or materials in the record, or by showing that Plaintiffs cannot produce admissible evidence to support their position.

Doc. 63 at 17. Plaintiffs apparently misunderstand their burden in responding to a summary judgment motion. Defendants would indeed have failed in their quest for summary judgment had Plaintiffs come forth with admissible evidence—but Plaintiffs have not done so, and Defendants are entitled to summary judgment on Plaintiffs' punitive damages claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ("A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," which entitles the moving party to judgment as a matter of law).

17

**CONCLUSION**

In sum, the Court finds and concludes that Plaintiffs have not presented any material disputes of fact to support claims of fraud and negligent misrepresentation in Counts Three and Four, either with regard to any individual employee or under an agency theory.

I also find and conclude that Plaintiffs has not established the essential elements to support a claim for punitive damages against the Defendants.

The Court cannot make inferences that are favorable to Plaintiffs when there is no evidence presented that gives rise to such inferences.  The Court is not unsympathetic to Plaintiffs' predicament, particularly Paul and Patricia Thistlethwaite, Kyle's parents, and their disappointment and frustration over the closing of SCTC before Kyle could finish the 90-day program they had signed up for.  However, the Court's impression of this case has been, and still is, that it is essentially a pure contract dispute.  *See* Doc. 70 n.4 ("In fact, the Court would go as far to say that this lawsuit has all the earmarks of a contract dispute – and nothing more.")

There are two remaining claims in this lawsuit: (1) Plaintiff's Breach of Contract Claim in Count One, limited to direct damages flowing from the alleged breach; and (2) Unjust Enrichment in Count Nine.  The Court here makes no determination on any alleged breach of an implied covenant of good faith and fair dealing, which is mentioned in the complaint as part of Count One, *see* ¶ 50, but has not been separately alleged as a claim by Plaintiffs and not discretely addressed by the parties.  *See also* Doc. 76 & n.2 (Mem. Opin. & Order) (noting that Plaintiffs' reference to implied covenant claim was not responsive to Defendants' arguments and that Plaintiffs had not separately alleged such a claim).

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims of Fraud, Negligent Misrepresentation, Tortious Interference with Contract, Agency and Punitive Damages **(Doc. 49)** is hereby GRANTED with regard to Plaintiffs' claims of fraud in Count Three, negligent misrepresentation in Count Four, and claims for punitive damages and denied as moot with regard to Plaintiffs' tortious interference claim in Count Two which was dismissed previously by stipulation of the parties.  *See*  Doc. 71.

_____
UNITED STATES DISTRICT JUDGE